IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PT (PERSERO) MERPATI** <br>     **NUSANTARA AIRLINES,** <br> <br>     **Plaintiff,** <br> <br> vs. <br> <br> **THIRDSTONE AIRCRAFT LEASING** <br>     **GROUP, INC.,** <br> <br>     **Defendants.** | : <br> : <br> : <br> : <br> : <br> : Civil No. 1:07-cv-00717 <br> : RJL <br> : <br> : <br> : <br> : <br> : |

**AFFIDAVIT OF JON COOPER IN SUPPORT OF
OPPOSITION OF NON-PARTY WITNESS, JON COOPER,
TO EMERGENCY MOTION TO COMPEL ATTENDANCE AT DEPOSITION**

My name is Jon C. Cooper. I am an adult citizen of the United States. I have personal knowledge of the matters contained in this Affidavit, and I am competent to testify thereto.

I offer this Affidavit in support of the Opposition of Non-Party Witness, Jon Cooper, to Emergency Motion to Compel Attendance at Deposition.

1. I am unable to attend a deposition on September 27 or September 28 because I am involved in business meetings and related activities that I cannot reschedule or cancel related to a critical contract pursuant to which I am performing environmental consulting services on a United States Government project. I leave for Burkina Faso, in Africa, on the morning on September 29 as part of that contract. At the same time, I am engaged in securing investment funding for a project, which is currently referred to as "Pigeon Air," to provide direct airline service to Nigeria from the United States. On

September 27 and 28, I will, in addition to working on the Burkina Faso project, be meeting with investors from Nigeria. My meetings and related work cannot be rescheduled or canceled without seriously jeopardizing one or both projects and risking the loss of a significant amount of income.

      2.      My primary business is providing consulting services in the environmental field. Much of my work is for government agencies, both domestic and foreign, and much of it relates to international projects.

      3.      The Burkina Faso project is an emergency mission in the environmental field, which has taken dozens of hours to put together. The project is shown in the attached Work Description. The project involves the contribution of between $25 million and $75 million in aid from the United States under the Millennium Challenge Corporation ("MCC"), which is part of the State Department, to Burkina Faso in Africa, one of the poorest countries on Earth.

      4.      The team has 25 members, but my role, as the "Environmental Specialist," is pivotal. This is clear in the attached Work Description, which provides, in part: "[T]he Environment Specialist has primary responsibility for answering the environmental DD questions listed in Annex 6 relating to environmental assessment." The Work Description also provides, "The Environmental Specialist must be in Ouagadougou, Burkina Faso, ready to begin work on October 1, 2007." This is because the Environmental Specialist is part of the oversight team that reports directly the Team Leader. Under U.S. law, I am preparing the required elements that will look at environmental aspects of the engineering and agricultural subteams.

5. I must be in Burkina Faso to meet the entire team on Monday October 1 and give them direction. Then, on Wednesday we all head out to the field. If I arrive late, I violate my contract -- and several team members have been bounced because MCC has strong rules regarding compliance and timeliness. In addition, if I do not arrive on time, I will miss the transportation to the field, which has been specially arranged. I must be in Burkina Faso on time because my part of the project is required by U.S. law.

6. Also as a requirement of the contract, I must finish an inception report before I leave, and that entails reviewing 200 files on the project web site and preparing a detailed report. I only have a limited time to do this because the project approvals, etc. did not allow me to start until September 26. I am working on that report when I am not meeting with business representatives.

7. My compensation for the Burkina Faso project will be approximately $49,000. If I miss the first part of the mission, they will tell me not to go and I will lose that income. This will result in a great loss to me, and the project cannot be easily replaced. Environmental programs for me are opportunistic, and I do not expect to see another one for 3-6 months. Moreover, if the contract is extended, which is possible, the contract could be worth approximately $100,000 to me, which will be lost if I do not prepare for the trip and arrive on time.

8. With respect to the Pigeon Air project, I had a carefully scheduled set of meetings and milestones on that project, which culminated with visits from the Nigerian investors. This has taken hundreds of hours of time to prepare the complicated spread sheets and discussion documents. They were necessary to show that this will be an operation that will be worth hundreds of millions of dollars in the next four or five years.

The investors are being asked to invest $60 million into the project, and my work entails demonstrating to them that such an investment is sound.

9. I have staff in England, Germany and the United States working on the Pigeon Air project, and it took many, many hours of preparation work on my part.

10. Additionally, I have been involved in a project called "Volcano," which is a waste-to-energy project that is in the final negotiations for a new factory in Pakistan and, later, in Canada. Again, these involved coordination between energy and waste specialists in the private and government sector.

11. These activities have consumed my time to date, and, other than necessary breaks for meals and rest, I will be devoting my time to them between now and the time that I leave for Burkina Faso on the morning of Saturday, September 29. (I will also be observing Sukkoth, a Jewish holiday, on the evening of September 27, and the evening of September 28 is the beginning of the Jewish Sabbath.) I cannot reschedule or cancel any of these activities without jeopardizing one or both projects, and risking the loss of a significant amount of income.

12. My travel schedule will take me to Burkina Faso, then probably to Lagos, Nigeria, and then to London. My return date is not certain, but I expect to be back in the United States by mid-November.

13. I have cooperated, through my counsel, with counsel for Merpati, and I intend to continue to do so. I will appear for a deposition at a time when my appearance will not threaten my projects and my ability to earn income. I expect to be available for

that purpose beginning in mid-November, subject to Orders of Court and agreements of counsel regarding this matter and the conduct of discovery in a case that Merpati has just filed against me.

FURTHER AFFIANT SAYETH NAUGHT

I, JON C. COOPER, DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

_____
Jon C. Cooper

Executed on September 27, 2007

Respectfully submitted,

           BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC


           By:    _____/s/_____
                  Geoffrey T. Hervey, # 415907
                  7315 Wisconsin Avenue, Suite 800 West
                  Bethesda, Maryland 20814
                  301-656-2707 phone
                  301-961-6525 fax
                  ghervey@bregmanlaw.com
                  Counsel for Jon C. Cooper, Ph.D.

Exhibit B

<u>Work Description</u>

**Millennium Challenge Corporation (MCC) Project Assessment and Development Services for Hydro-Agricultural Projects – Government of Burkina Faso Compact Proposal**

**Hydro-Agricultural Projects, Burkina Faso**
**Terms of Reference (TOR):  Environment Specialist**

**Jonathan Cooper**

**September 2007**

### 1.0    BACKGROUND

The Millennium Challenge Corporation (MCC) is awarding a Task Order to Roche International, Inc. for consulting services to conduct Due Diligence on proposed water and agricultural development projects which are part of the proposal (Program) of the Government of Burkina Faso (GoBF) submitted to MCC in October 2006.  Roche International Inc. is sub-contracting with ARD, Inc. for the services of a team of agricultural specialists who will work closely with a team of engineers under this Task Order to complete the tasks outlined in the Request for Proposals (RFP) No. MCC-07-RFP-0022 (Hydro-Agricultural Projects, Burkina Faso).  The Program seeks to promote economic growth and reduce poverty by (i) fostering improved agricultural productivity including livestock, fisheries, and land use, and (ii) improving access to national and international markets.   That program will be managed by MCA-Burkina Faso, an entity specially constituted by the GoBF.

MCC's Due Diligence process consists of the overall assessment of a country's Program to determine whether the Program is sufficiently developed and qualified to advance to the Compact negotiation stage.  The projects included in this Task Order will be assessed for relevance, suitability, impact on economic growth and poverty alleviation, technical viability and sustainability.  In addition, projects will also be reviewed for compliance with other applicable guidelines, in particular the MCC Environmental Guidelines and MCC Guidelines for Economic Analysis.  The principal assessments to be undertaken in order to make that determination form the basis for RFP's scope of work, which is incorporated by reference into these summary Terms of Reference (TOR).

The Program includes four projects aimed at improving agricultural development and increasing revenues by targeting and developing the agricultural value chains in the Sourou Valley and in the Comoe Basin.  Along with each of these projects the GoBF submitted pre-feasibility (APS) and/or feasibility (APD) level studies with detailed design and drawings, and or tender

documents (DAO). Work outlined in the RFP statement of work and summarized in this TOR will focus on reviewing, verifying and evaluating the data, information and studies provided by the GoBF, according to MCC's due diligence (DD) criteria.

The projects proposed by the GoBF that are included in the scope of this due diligence are essentially hydro-agricultural development projects that can be grouped under two geographic locations: the Sourou Valley and the Comoe Area.

### 1. Projects in the Sourou Valley:

Working through an entity called the Autorite de la Mise en valeur de la Valee du Sourou (AMVS), the GoBF is seeking MCC financing for the three following projects:

    a.    rehabilitation of the Lery Dam and associated infrastructure;
    b.    hydro-agricultural development in Di; and
    c.    hydro-agricultural development in Dangoumana.

In addition to these projects, the GoBF proposes investments in constructing storage and processing facilities to support women's activities at existing agricultural perimeters in the Sourou Valley, at Di, and Dangoumana.

(For detailed descriptions of these projects, see the MCC RFP, p.p. 10-14.)

### 2. Projects in the Diarabakoko-Tengrela perimeter in the Comoe:

The GoBF intends to develop a 1,500 hectare area on the Diarabakoko-Tengrela irrigated perimeter. This perimeter is located in the western part of Burkina Faso, in the cascades region, Comoe-Leraba Province, Banfora Department. Proposed investments are grouped in three activities:

    a.    irrigation infrastructure in support of agricultural development;
    b.    gender-specific storage and processing facilities, and
    c.    technical assistance, capacity building and professional-organization.

(For detailed descriptions of these projects, see the MCC RFP, p.p. 14-16.)

### 2.0    ACTIVITIES

Under this Task Order, MCC expects the Roche-ARD team to review the existing studies and documents, conduct site visits, and undertake an assessment of the above projects. The team shall provide MCC with independent reports summarizing the findings thus providing an evaluation of the completeness and suitability of the GoBF studies to reach the goals of the projects. This assessment will provide the basis for MCC to make a decision to commit funds for the subsequent phases of project development, including preparation of further feasibility studies, environmental impact assessments (EIA), resettlement action plans (RAP), final designs and bid documents, and eventual construction. The main objective of the assignment is to provide MCC with assurance regarding the overall economic, technical, environmental, social

and institutional viability of the project in order that MCC may complete its due diligence assessment of the proposed projects. (See RFP p.p. 17-18 for a detailed outline of overall Task Order required tasks and analytical steps.

### 2.1. Summary of Agriculture Team and Cross-Cutting Activities:

The Agricultural Team Leader is responsible for supporting the overall Task Order Team Leader, and for coordinating the work of the following eight Task Order team members whose services are provided by ARD, Inc. under the Task Order sub-contract to Roche International, Inc.:

- Agriculture Market Information Specialist
- Producer Organization Development Specialist
- Fresh Water Fisheries Value Chain Specialist
- Specialist Post Harvest Technology Fruits/Vegetables
- Soil Fertility Specialist
- Agricultural Economist
- Water Users Association Specialist
- Environmental Specialist

In addition to these consultants, the Task Order team includes engineers and other experts provided directly by Roche International or by another of its sub-contractors. Those other team members include various engineers and resettlement/social science or institutional experts.

The agriculture team (which includes all the ARD consultants listed above except for the water users' association and environmental specialists, whose work falls under the technical direction of the overall team leader), is required under the RFP to produce five specific assessments, including:

- Agriculture Market Information Assessment;
- Producer Organization Development Assessment and Design for Irrigated Areas;
- Fresh Water Fisheries Value Chain Assessment and Design;
- Appropriate Post-Harvest Technology Appraisal for Fruits and Vegetables; and
- Assessment of Soil Fertility in the Hydro-Agricultural Development Areas.

Similarly, MCC is requiring, among others, a "cross-cutting assessment" (Section 6.4) that will define much of the work of the Environment and Water Users Association specialists. This assessment covers environmental and social aspects of the projects and is also described in detail in Section 6 of the RFP.

Finally, the Agricultural Team Leader will need to work closely with the Agricultural Economist to assist in building the "Economic Rate of Return (ERR) calculation model, under the guidance of the MCC's Economist," and in evaluating "Land Tenure Aspects" as described in RFP Section 6.4.

Note that the RFP's Annex 5 "Agriculture Due Diligence (DD) Questions" summarizes the MCC's guiding principles for this assignment (transformation efforts must be "market driven," change behavior through "market incentives: and "change should be guided by adapting international best practices to the local situation."), and regarding the agricultural projects, bases the exercise on "the value-chain approach to project analysis." There follows a list of 14 due diligence questions that the team must answer in regard to the irrigation support, grades and standards, and market infrastructure activities being evaluated. (See Annex 5, RFP pages 55-56). Similarly, Annex 6 (pages 57-59) provide the DD questions for environmental and social assessment elements of the assignment.

**2.2.    Environment Specialist activities:**

Hence, the Environment Specialist has primary responsibility for answering the environmental DD questions listed in Annex 6 relating to environmental assessment. In so doing, (s)he will be expected to:

- Formulate and approve environmental safeguard documentation;
- Suggest best management practices for stream and stream banks protection, rehabilitation and enhancement;
- Complete the International Commission on irrigation and Drainage (ICID) Environmental Checklist (provided in RFP Annex 7); and
- Address the DD questions outlined in Annex 5, sections B, C and E.

**3.0    DELIVERABLES**

The Environmental Specialist shall provide, to the satisfaction of the Team Leader and ultimately to the MCC, the required contributions to the following overall Task Order deliverables included on RFP pages 34-35. They include:
- an Inception Report with in one week of "Notice to Proceed (NTP) outlining the entire team's work plan, approach and strategy;
- an Interim Report due within five weeks of the NTP summarizing key findings and an outline of the final report;
- a Draft Final Report or reports, due within eight weeks of the NTP;
- a Final Report or reports, within two weeks of receiving the MCC's comments on the Draft Final Report(s);
- if MCC deems necessary, TORs to guide preparation of feasibility studies complete with EIAs, RAPs, final design, drawings, and tender documents; and
- a comprehensive inventory of all relevant documents made available and collected, and those documents should be shared with the MCC as they are obtained.

The Environmental Specialist, to the satisfaction of the Agriculture Team Leader and ultimately the MCC, must also produce the following specific deliverables according to the schedule to be developed in the Inception Report:

- Approved environmental safeguard documentation;
- Suggestions for best management practices to address stream and stream banks protection, rehabilitation and enhancement;
- A completed International Commission on irrigation and Drainage (ICID) Environmental Checklist (provided in RFP Annex 7); and
- Documentation that fully addresses the DD questions outlined in Annex 6, sections B, C and E of the RFP.

## 4.0    ACTIVITY BUDGET

The LOE for this assignment is **36 days plus two days travel,** to occur between October 1, 2007 and December 1, 2007. The LOE will be broken down as follows: two days' round trip to Burkina Faso; up to 24 days of field visit time (four weeks at six days per week); and up to 12 days for report preparation, review, and revision.

The Environmental Specialist must be in Ouagadougou, Burkina Faso, ready to begin work on October 1, 2007.